# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Starkey Laboratories, Inc., | No. 25-cv-2737 (SRN/DJF) |
| Plaintiff, | |
| v. | **ORDER ON MOTION FOR TEMPORARY RESTRAINING ORDER** |
| Phetsamone Saykeo, | |
| Defendant. | |

Cassandra B. Merrick, Christopher W. Madel, and Jennifer M. Robbins, Madel PA, 800 Hennepin Ave., Ste. 800, Minneapolis, MN 55403, for Plaintiff Starkey Laboratories, Inc.

SUSAN RICHARD NELSON, United States District Judge

Before the Court is the Motion for a Temporary Restraining Order ("TRO") [Doc. No. 5] filed by Plaintiff Starkey Laboratories, Inc. ("Starkey"). In addition to its memorandum of law, Plaintiff submits several exhibits and declarations from the following Starkey employees: Jeffrey P. Cook, Associate General Counsel—Intellectual Property [Doc. No. 8], Sunny Dery, Director of Security and Risk [Doc. No. 9], Jessica Pounds, Employment and Labor Counsel [Doc. No. 10], and Mandi Morrisey, Vice President of Human Resources [Doc. No. 11].

A hearing on Starkey's Moton for a TRO was held on July 7, 2025. Christopher Madel and Cassandra Merrick, counsel for Starkey, appeared at the hearing, as well as Starkey's in-house counsel, Mr. Cook and Ms. Pounds. Mr. Saykeo, who is currently unrepresented, but is seeking counsel, also appeared and agreed to the imposition of a TRO.

For the reasons set forth below, Plaintiff's motion is granted.

## I.    BACKGROUND

### A.  Employment Relationship and Starkey's Confidential Information

Starkey is a hearing aid manufacturer with its principal place of business in Eden Prairie, Minnesota.  (Compl. [Doc. No. 1] ¶ 5, Cook Decl. ¶ 4.)  Starkey manufactures both custom and non-custom hearing aids, and considers itself "the premier manufacturer" of custom hearing aids.  (Cook Decl. ¶ 4.)  Starkey employed Defendant Phetsamone Saykeo for over 25 years, from 1997 to 2003, and from 2005 to 2025.  (*Id.* ¶ 3; Compl. ¶ 6.)  Among Mr. Saykeo's engineering-based roles, he served as Manufacturing Program Manager.  (Cook Decl. ¶ 3.)

To manufacture its custom hearing aids, Starkey applies trade secrets it has created "through years of research, development, and continuous improvement."  (*Id.* ¶ 5.)  Starkey contends that its trade secrets have resulted in the production of comfortable and effective custom hearing aids and non-custom hearing aids.  (*Id.*)

To protect its confidential business information—including trade secrets, product designs, customer data, and strategic plans—Starkey takes several precautions.  (Dery Decl. ¶¶ 2–12.)  Starkey's security measures include the following:  (1) using cybersecurity protocols and physical security protocols to safeguard its confidential information (these protocols include (a) using computer network firewalls, intrusion detection and prevention systems, VPN access for remote employees, and monitoring and logging all computer network traffic for anomalies; (b) encrypting all sensitive data using industry-standard encryption protocols; (c) equipping all company devices with advanced endpoint detection

and response tools, antivirus software, and device management policies, and prohibiting the use of unmanaged personal devices to access company data; and (d) using a third-party provider to monitor for threats and respond to cybersecurity incidents in real time); (2) restricting access to confidential information to authorized personnel; (3) logging and auditing all access to confidential information, and monitoring for any unauthorized data leakage or accidental disclosure of company information; (4) marking documents that contain Starkey confidential information accordingly; (5) requiring Starkey suppliers and employees to enter into confidentiality agreements; (6) training Starkey employees in the protection of confidential information through both formal training and ongoing communication with the legal department and Starkey management; (7) strictly enforcing acceptable use, data handling, and incident reporting related to cybersecurity; (8) requiring vendors and contractors to undergo security assessments; and (9) regularly evaluating the effectiveness of and operational status of its security controls.  (Cook Decl. ¶ 7; Dery Decl. ¶¶ 2–12.)

Starkey's IP in-house counsel, Mr. Cook, attests that during Mr. Saykeo's employment, Mr. Saykeo had "extensive access to Starkey trade secrets relating to the manufacture of Starkey products, including Starkey's custom hearing aids."  (Cook Decl. ¶ 3.)  Mr. Saykeo and Starkey entered into the Confidentiality and Noncompete Agreement (the "Agreement") when Mr. Saykeo resumed his employment with Starkey in 2005. (Pounds Decl., Ex. 3 [Doc. No. 10-3] (Agmt.).)  The following provisions are relevant to the instant motion:

## 2. CONFIDENTIAL INFORMATION

"Confidential Information" means information not generally known that is proprietary to or within the unique knowledge of Starkey Laboratories, Inc., whether or not conceived, originated, discovered, or developed in whole or in part by Employee.

Employee agrees not to directly or indirectly use or disclose Confidential Information for the benefit of anyone other than Starkey Laboratories, Inc., either during or after employment, for as long as the information retains the characteristics described in the previous paragraph. During the term of employment and at all times thereafter, Employee agrees to maintain and use Confidential Information in the strictest confidence and, except with the consent of Starkey Laboratories, Inc., not to directly or indirectly reveal, report, publish, disclose, or transfer, any Confidential Information to any person, firm, corporation, or other entity or utilize any Confidential Information for Employee's own benefit or intended benefit or for the benefit or intended benefit of any other person, firm, corporation or other entity.

## 3. DOCUMENTS AND TANGIBLE ITEMS

Employee acknowledges that all notes, data, reference materials, documents, business plans, business and financial records, computer programs, and other materials that in any way incorporate, embody, or reflect any Confidential Information, whether prepared by Employee or others, are the exclusive property of Starkey Laboratories, Inc., and Employee agrees to forthwith deliver to Starkey Laboratories, Inc., all such materials, including all copies or memorializations thereof, in Employee's possession or control, whenever requested to do so by Starkey Laboratories, Inc., and in any event, upon termination of Employee's employment with Starkey Laboratories, Inc.

## 4. POST-EMPLOYMENT RESTRICTIONS

Employee agrees that for ninety days after termination of employment he/she will not directly or indirectly render service (including services in research) to any person or entity in connection with the design, development, manufacture, marketing, or sale of hearing aids or hearing aid accessories that are sold or intended for use or sale in any geographic area in which Starkey Laboratories, Inc., actively markets a Starkey Laboratories, Inc. product of the same general type or function.

(*Id.* ¶¶ 2–4.)  The Agreement further provides that Starkey is entitled to immediately enjoin any Employee from any violation or threatened violation of the agreement, in addition to all legal and equitable remedies, and that the agreement shall be construed under Minnesota law.  (*Id.* ¶¶ 5–6.)

### B.  June 2025 Conduct

On June 16, 2025, Mandi Morrisey, Starkey's Vice President of Human Resources, was informed that Mr. Saykeo had submitted his resignation.  (Morrisey Decl. ¶¶ 1–2.)  He expected to work his last day at Starkey on June 26 or 27, 2025.  (*Id.*) On June 23, 2025, Ms. Morrisey learned that Mr. Saykeo planned to work for a start-up competitor called Chromatic, Inc. ("Chromatic").  (*Id.*; Pounds Decl. ¶ 13.)  Starkey's IP in-house counsel, Mr. Cook, states that Chromatic is in the process of developing hearing aid technology, as reflected by its patent filings and hiring of hearing aid industry personnel, such as its VP of Audiology, who is a former Starkey employee.  (Cook Decl. ¶ 14.)  To Mr. Cook's knowledge, Chromatic does not currently market any commercially available products, as reflected on its website, which states, "High-tech.  Hard-tech.  Healthcare" and "Coming soon."  (*Id.*)

Due to Ms. Morrisey's concerns about the potential misappropriation of confidential Starkey information, she requested a report of Mr. Saykeo's computer activity for the previous 30 days.  (Morrisey Decl. ¶ 4.)  The report, generated by Starkey's Director of Security and Risk, Sunny Dery, showed that Mr. Saykeo had downloaded a 16-page confidential document (identified as Windchill Document 0023811) to an external USB drive on June 12, 2025, and had also printed a hard copy of the document.  (*Id.* ¶ 5 &

Morrisey Decl., Ex. 1 [Doc. No. 11-1) (Access Rpt.); Cook Decl. ¶ 9.)  The document contains the following caption:  "This document contains Starkey's Confidential and Proprietary information.  Do not copy or disclose any information in this document without written permission from Starkey. © 2021 Starkey." (*See* Cook Decl. ¶ 12; Pounds Decl. ¶ 5.)  Starkey's IP in-house counsel, Mr. Cook, has reviewed the document and states that it contains "extensive confidential, proprietary, and trade secret information belonging to Starkey relating to the manufacture of hearing aids." (Cook Decl. ¶¶ 10–11.)  Based on these confidentiality markings, as well as the nature and content of the document, Mr. Cook believes that "any Starkey employee with access to this document would know that it contains highly sensitive confidential information." (*Id.*  ¶ 13.)

On June 26, 2025, Ms. Morrisey met with Mr. Saykeo, and Rex Ge, the Vice President of Mr. Saykeo's department. (Morrisey Decl. ¶ 6.)  At the meeting, Ms. Morrisey reminded Mr. Saykeo of the terms of the Agreement. (*Id.* ¶ 7.)  She showed him the report indicating that he had downloaded Windchill Document 0023811, and she stated Starkey's understanding that this document was a confidential trade secret. (*Id.*)  When Mr. Saykeo responded that the report must have been in error, Ms. Morrisey again pointed to the report, which appeared to show that Mr. Saykeo had attempted to download the same document a second time, and that he had saved it to a USB drive on June 12, 2025. (*Id.* & Morrisey Decl., Ex. 1 (Access Rpt.).)  Ms. Morrisey advised Mr. Saykeo that his conduct violated company policy, violated the Agreement, and could violate the law, as the document contained Starkey's trade secrets. (Morrisey Decl. ¶ 7.)  Mr. Saykeo acknowledged that Windchill Document 0023811 contained Starkey's trade secrets. (*Id.*)  Additionally, Mr.

Saykeo admitted that he had downloaded the document on a USB drive in case he needed to "remember something." (*Id*. ¶ 8.) Ms. Morrisey requested that Mr. Saykeo return the USB drive and all documents belonging to Starkey. (*Id*.)

Ms. Morrisey gave Mr. Saykeo a Starkey form labeled "Certification of Return of Proprietary and Confidential Information." (*Id*.) Mr. Saykeo reviewed and signed the form. (*Id.* & Morrisey Decl., Ex. 2 [Doc. No. 11-2] (Certif. of Return of Confid. Info.).) In the form, Mr. Saykeo acknowledged the return of all Starkey documents and materials containing trade secret information, including, but not limited to Windchill Document 0023811. (Morrisey Decl., Ex. 2 (Certif. of Return of Confid. Info.).) He then left Ms. Morrisey's office to retrieve the USB drive and returned with a drive approximately five minutes later. (Morrisey Decl. ¶ 10.) In Mr. Saykeo's presence, Ms. Morrisey plugged in the USB drive and found it contained only Mr. Saykeo's resume and personal photos, but not the document in question. (*Id.*) Suggesting that it might be at home, Mr. Saykeo left to retrieve it. (*Id.*)

Mr. Saykeo returned to Starkey later that day, carrying a brown plastic Cub Food grocery store bag filled with shredded paper. (*Id.* ¶ 11; Pl.'s Mem. Supp. Mot. for TRO [Doc. No. 7] at 9.) He explained that he could not locate the USB drive and could not find a printed version of the document, so he surmised that he must have shredded the paper copy. (Morrisey Decl. ¶ 11.) When Ms. Morrisey directly asked if he had indeed shredded the document, Mr. Saykeo explained that he had "called them" and "they said" if he had anything, he needed to shred it and "they" did not want anything, so he admitted to shredding the document. (*Id.*) Describing his own actions as a "huge mistake," Mr. Saykeo

surmised that he must have deleted the file from the USB drive and shredded the paper copy of the document. (*Id.*) Although he offered to put the shredded contents of the Cub bag into Starkey's shredded paper bin, Ms. Morrisey asked to keep it. (*Id.*) Mr. Saykeo provided the bag to Ms. Morrisey. (Pounds Decl. ¶ 10.)

At the meeting, Mr. Saykeo verified that he planned to work for Chromatic and he inquired about the effect of his noncompete provision with Starkey. (Morrisey Dec. ¶¶ 9, 12.) Ms. Morrisey expressed uncertainty about it because Mr. Saykeo had not yet returned Starkey's property. (*Id.*) When she asked if Mr. Saykeo had signed an offer letter from his new employer, he said that he had and pulled up the letter on his phone. (*Id.*) He read parts of the Chromatic offer letter to Ms. Morrisey and stated that it was silent on the subject of his noncompete agreement. (*Id.*) Mr. Saykeo then returned his Starkey computer to Ms. Morrisey, exchanged phone numbers with her, and left. (*Id.*)

Ms. Morrisey provided the Cub Foods grocery bag to Jessica Pounds, Starkey's employment and labor law in-house counsel. (*Id.*) Ms. Pounds inspected the shredded paper. (Pounds Decl. ¶¶ 11–12.) She suspected that it did not include Windchill Document 0023811, as she observed a Minnesota Wild hockey logo on a piece of shredded paper, along with shredded paper containing printed text. (*Id.*) As for the shredded paper that included printed words, she ran a search through Windchill Document 0023811 to see if any of the words from the shredded paper matched the Windchill document. (*Id.* ¶ 12.) They did not. (*Id.*) Mr. Saykeo has not provided the printed copy of Windchill Document 0023811, nor the USB drive, to Starkey, and Ms. Pounds believes that Mr. Saykeo has retained access to them. (*Id.* ¶ 15.)

8

Mr. Cook, Starkey's IP in-house counsel, states that start-up competitor Chromatic "could derive substantial benefits from extracting trade secrets from Starkey employees and using this information to develop competing Chromatic hearing aids based on Starkey confidential information, such as the information contained in Windchill Document 0023811." (Cook Decl. ¶ 14.) Mr. Cook further believes that the disclosure of Starkey's trade secrets to Chromatic would cause immediate and irreparable harm to Starkey, as well as "the erosion of Starkey's competitive and reputational advantages derived from its trade secrets." (*Id.* ¶ 15.)

### C.  Plaintiff's Complaint and Motion for a TRO

On June 30, 2025, Starkey filed its Complaint in this action, asserting three claims against Mr. Saykeo:  (1) misappropriation of trade secrets in violation of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836 *et seq.* (Count 1); (2) violation of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030 *et seq.* (Count 2); and (3) breach of contract under Minnesota common law.  (Compl. ¶¶ 91–120.)  Starkey seeks injunctive relief, damages for actual loss caused by the alleged misappropriation of trade secrets, and double damages and attorneys' fees.  (*Id.* at 21–22.)

In the instant motion, Starkey seeks a TRO under Federal Rule of Civil Procedure 65 to enjoin Mr. Saykeo "from further violating his agreements with Starkey, misappropriating Starkey's trade secrets, and competing with Starkey." (Pl.'s Mem. Supp. Mot. for TRO at 13.)  Mr. Saykeo, who is not represented by counsel at this time, but is seeking counsel, filed no written response in opposition.  At the hearing on this matter, Mr. Saykeo agreed to the imposition of a TRO.

9

## II.    DISCUSSION

Federal Rule of Civil Procedure 65 authorizes the Court to grant injunctive relief in the form of a TRO.  The purpose of a TRO is to maintain the status quo.  *Kelley v. First Westroads Bank*, 840 F.2d 554, 558 (8th Cir. 1988).  However, injunctive relief is an "extraordinary" remedy and the burden rests with the movant to establish that it should be granted.  *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003) (discussing motion for preliminary injunction); *Tumey v. Mycroft AI, Inc.*, 27 F.4th 657, 665 (8th Cir. 2022) (noting that the standard for analyzing a motion for a temporary restraining order is the same as a motion for a preliminary injunction).  To determine whether injunctive relief is proper, a district court considers four factors: (1) the movant's likelihood of success on the merits, (2) the threat of irreparable harm to the movant, (3) the balance between the harm to the movant and the injury that granting an injunction will inflict on other parties to the litigation, and (4) the public interest.  *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981).  "At base, the question is whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined."  *Id.*  The Court finds that Starkey has satisfied its burden, at this stage, with respect to each factor, as the Court explains below.

### A. Likelihood of Success on the Merits

The "likelihood of success" factor requires Starkey to show "'only . . . a reasonable probability of success, that is, a fair chance of prevailing' on the merits."  *Paisley Park Enter., Inc. v. Boxill*, 253 F. Supp. 3d 1037, 1043 (D. Minn. 2017) (quoting *Kroupa v. Nielsen*, 731 F.3d 813, 818 (8th Cir. 2013)).  Although Starkey argues that it is likely to

succeed on all three of its claims, it must only demonstrate that it is likely to succeed on one of its claims to satisfy this *Dataphase* factor. *See United Healthcare Ins. Co. v. AdvancePCS*, 316 F.3d 737, 742–43 (8th Cir. 2002); *see also Nilfisk, Inc. v. Liss*, No. 17-CV-1902 (WMW/FLN), 2017 WL 7370059, at *4 (D. Minn. June 15, 2017)); *Lifetime Fitness, Inc. v. Wallace*, No. 12-cv-740 (JRT/FLN), 2012 WL 1517262, at *2 (D. Minn. Apr. 30, 2012.)

## 1. DTSA Claim

To demonstrate a misappropriation of trade secrets, a plaintiff must show the existence of a protectable trade secret and misappropriation of that secret. *MPAY Inc. v. Erie Custom Computer Applications, Inc.*, 970 F.3d 1010, 1016 (8th Cir. 2020) (citing *Phyllis Schlafly Revocable Tr. v. Cori*, No. 4:16CV01631 JAR, 2016 WL 6611133, at *2 (E.D. Mo. Nov. 9, 2016) (identifying elements of misappropriation of trade secrets under the federal DTSA)). A "trade secret" refers to

> all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if—
>
> > (A) the owner thereof has taken reasonable measures to keep such information secret; and
> >
> > (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information;

18 U.S.C. § 1839(3)(A)–(B); *see also Prime Therapeutics LLC v. Beatty*, 354 F. Supp. 3d 957, 967 (D. Minn. 2018).

The Court finds that Starkey has shown at this early stage that Windchill Document 0023811 constitutes a trade secret. The document concerns Starkey's manufacture of custom hearing aids—information that is not generally known, and that results from Starkey's investment in research and development. (Cook Decl. ¶ 5.) The face of the document further reflects that it is not generally known, as it purports to contain "Starkey's Confidential and Proprietary information," and prohibits copying or disclosure without Starkey's written permission. (*Id.* ¶ 12.) Moreover, Mr. Saykeo acknowledged that the document contains Starkey's trade secrets. (Morrisey Decl. ¶ 7.)

The document also has competitive value to Starkey in light of its confidentiality and content. (Cook Decl. ¶¶ 5–6.) Additionally, Starkey has taken numerous precautions to safeguard its trade secrets. (*See, e.g.*, Dery Decl. ¶¶ 2–12; Cook Decl. ¶ 7.)

As to the element of misappropriation, under the DTSA, misappropriation means

(A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(B) disclosure or use of a trade secret of another without express or implied consent by a person who—

    (i) used improper means to acquire knowledge of the trade secret;

    (ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was—

        (I) derived from or through a person who had used improper means to acquire the trade secret;

12

(II)     acquired under circumstances giving rise to a duty to
maintain the secrecy of the trade secret or limit the use of
the trade secret; or

(III)    derived from or through a person who owed a duty to the
person seeking relief to maintain the secrecy of the trade
secret or limit the use of the trade secret; or

(iii)    before a material change of the position of the person, knew or
had reason to know that—

(I)      the trade secret was a trade secret; and

(II)     knowledge of the trade secret had been acquired by
accident or mistake.

18 U.S.C. § 1839(5)(A)–(B).

The Court finds that Starkey has shown sufficient evidence of misappropriation by
Mr. Saykeo's acquisition of Windchill Document 0023811 under the circumstances here.
Starkey has presented evidence that on June 12, 2025, around the time that Mr. Saykeo
announced his departure from Starkey, he downloaded and printed a copy of Windchill
Document 0023811 without Starkey's permission (written or otherwise), knowing that
Starkey viewed the document as confidential and proprietary information, as the document
is labeled as such. (Morrisey Decl. ¶¶ 5, 9 & Morrisey Decl., Ex. 1 (Access Rpt.); Cook
Decl. ¶ 12.)   He also expressed his intent to work for a competitor. (Morrisey Decl. ¶¶ 5,
9 & Morrisey Decl., Ex. 1 (Access Rpt.).)  Mr. Saykeo ultimately agreed that Windchill
Document 0023811 contains Starkey's trade secrets and admitted to downloading the
document, but he but has not returned the USB drive, nor has he returned the printed copy
of the document, (Morrisey Decl. ¶ 8, Pounds Decl. ¶ 15), despite signing Starkey's form
certifying the return of the document.  (Morrisey Decl., Ex. 2 (Certif. of Return of Confid.

Info.).)  Instead, he produced a bag of shredded mail that he attempted pass off as a shredded copy of Windchill Document 0023811.  (Morrisey Decl. ¶ 11; Pounds Decl. ¶¶ 11, 15.)  At this time, Mr. Saykeo's use and disclosure of the document are unknown, but the evidence presented here sufficiently shows that he acquired and retained Starkey's trade secret document by improper means.

For purposes of this motion, the Court finds that Starkey has established a likelihood of success on the merits of its DTSA claim.

## 2.  Breach of Contract Claim

The Court also considers the likelihood of success on Starkey's breach of contract claim, as the noncompete provision in the contract implicates Starkey's requested relief in the instant motion.[1]  To prevail on a claim for breach of contract under Minnesota law, Starkey must show "(1) formation of a contract, (2) performance by plaintiff of any conditions precedent to his right to demand performance by the defendant, and (3) breach of the contract by defendant."  *Carlsen v. GameStop, Inc*., 833 F.3d 903, 911 (8th Cir. 2016) (quoting *Park Nicollet Clinic v. Hamann*, 808 N.W.2d 828, 833 (Minn. 2011)).

Based on the record currently before the Court, albeit limited, the Agreement appears to establish the first element for a breach of contract claim—contract formation.

---

[1] Because Starkey's DTSA claim and CFAA claim both implicate the confidentiality provision of the Agreement, and contemplate similar forms of injunctive relief related to confidential information and trade secrets, the Court need not consider the likelihood of success on the merits of the CFAA claim at this time, having found that Starkey has shown the likelihood of success on the merits of its DTSA claim.  *See United Healthcare Ins. Co*., 316 F.3d at 742–43.  However, because the breach of contract claim also implicates the noncompete provision of the Agreement, the Court addresses the likelihood of success on the merits of that claim, above.

14

Mr. Saykeo and a Starkey representative signed the Agreement, which states that it was entered into "for good and valuable consideration" in 2005, (Cook Decl. ¶ 3), and it contains no termination date. (Pounds Decl., Ex. 3 (Agmt.) at 2.) Furthermore, Mr. Saykeo's conduct in questioning Ms. Morrisey about "what would happen with his noncompete" (Morrisey Decl. ¶ 12) also supports the finding of an enforceable noncompete provision, for purposes of this motion.

As to the second element—the performance of conditions precedent by Starkey— the Agreement contemplated that "for good and valuable consideration," Starkey would give Mr. Saykeo access to Starkey's confidential technology and product information. (Pounds Decl., Ex. 3 (Agmt.) at 2.) It appears that Starkey gave Mr. Saykeo such access in order for him to perform his work, with the understanding that he would abide by the restrictions in the agreement regarding the use, non-disclosure, and return of Starkey's confidential information. (*See id.* ¶¶ 2–4.)

Similarly, it appears from the Agreement that another condition of Mr. Saykeo's hiring and employment was the 90-day period of noncompetition with any future employer involved in the design, development, manufacture, marketing, or sale of hearing aids or hearing aid accessories in any geographic area in which Starkey actively markets a similar product. (*See id.* ¶ 4.)

Finally, as to the third element for a breach of contract claim—evidence of the defendant's breach—Starkey has submitted evidence showing that Mr. Saykeo breached the confidentiality provision of the agreement by accessing and retaining Starkey's trade secrets, specifically, Windchill Document 0023811, and that he breached the noncompete

provision by entering into an employment agreement with a hearing-aid competitor less than 90 days after his departure from Starkey—in fact, it appears that he entered into the Chromatic employment agreement while still employed by Starkey. (Morrisey Decl., Ex. 1 (Access Rpt.); Cook Decl. ¶ 9; Pounds Decl. ¶ 13 & Ex. 3 (Agmt.) ¶ 4.)

Discovery will ultimately impact the likelihood of success of Starkey's breach of contract claim. However, on the current record, and to maintain the status quo until the record is more fully developed, the Court finds that Starkey is likely to succeed on the merits of its breach of contract claim.

### B. Threat of Irreparable Harm

The second factor requires the Court to consider the threat of irreparable harm absent a temporary injunction. "Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009). The "loss of intangible assets such as reputation and goodwill can constitute irreparable injury." *United Healthcare*, 316 F.3d at 741. Courts have found the unauthorized use of an employer's confidential information that confers an advantage to a competitor in the marketplace sufficiently poses the threat of irreparable harm to the employer. *See, e.g., Mod. Controls, Inc. v. Andreadakis*, 578 F.2d 1264, 1270 (8th Cir. 1978) (finding that employer could suffer irreparable harm absent injunctive relief where employer sufficiently established that employee had violated noncompete and confidentiality agreement); *Hypro, LLC v. Reser*, No. 04-cv-4921 (DWF/JSM), 2004 WL 2905321, at *5 (D. Minn. Dec. 10, 2004) (finding that plaintiff established irreparable harm

16

by defendant's breach of contractual duties and use of confidential information to compete in the marketplace).

Starkey has shown that the manufacture of its hearing aids involves the application of trade secrets developed through years of research, and that it garners significant economic value from the confidentiality of its manufacturing processes and techniques, particularly with regard to custom hearing aids. (Cook Decl. ¶¶ 5–6.) Mr. Cook, Starkey's in-house counsel, attests that the disclosure of Starkey's trade secrets to Chromatic, a start-up competitor, "would cause immediate and irreparable harm to Starkey" due to the loss of confidential trade secrets, and the erosion of Starkey's competitive and reputational advantages. (*Id.* ¶ 15.) Moreover, Mr. Saykeo acknowledged in the Agreement that Starkey could enforce the agreement's provisions by seeking "to immediately enjoin [him]" from further violations. (Pounds Decl., Ex. 3 (Agmt.) ¶ 5.) This acknowledgement "bolsters a determination that irreparable harm will result from a breach of the [Agreement]." *Nilfisk*, 2017 WL 7370059, at *6 (citing *Life Time Fitness, Inc. v. DeCelles*, 854 F. Supp. 2d 690, 695 (D. Minn. 2012)).

Because there is evidence showing that Mr. Saykeo accessed, downloaded, and copied Starkey's trade secrets found in Windchill Document 0023811, (Morrisey Decl., Ex. 1 (Access Rpt.); Cook Decl. ¶ 9), which he did not return to Starkey, (Pounds Decl. ¶ 15), and because he intends to breach a noncompete provision by working for a competitor, (Morrisey Decl. ¶ 9), consideration of the threat of irreparable harm weighs in favor of granting a TRO to preserve the status quo.

### C. Balance of Harms

The Court must also balance the threat of irreparable harm to Starkey against the injury a TRO would cause Mr. Saykeo.  As noted, Starkey has shown that it faces a significant threat of irreparable harm based on Mr. Saykeo's acquisition and retention of confidential information and employment with a competitor.  (*See* Cook Decl. ¶¶ 5–6, 14–15.)  On the other hand, a TRO would likely impose a burden on Mr. Saykeo's ability to earn a living in the hearing aid field.  However, Mr. Saykeo voluntarily signed the Agreement, in which he agreed to the noncompete provision, and his own actions precipitated the instant motion.  *See U.S. Bank Nat'l Assoc. v. Kirk*, No. 25-cv-1926 (LMP/DTS), 2025 WL 1604092, at *9 (D. Minn. June 6, 2025) (rejecting employee's argument that balance of equities weighed in his favor due to imposition on professional livelihood because he voluntarily agreed to non-solicitation restrictions).  Mr. Saykeo voluntarily left his employment with Starkey mindful of his noncompete and confidentiality obligations.  (*See* Morrisey Decl. ¶¶ 11–12.)  On balance, the Court finds that the balance of harms weighs in Starkey's favor and supports the maintenance of the status quo at this time.

### D. Public Interest

Finally, the Court finds that the public interest supports Starkey's requested TRO, as it favors the enforcement of valid business agreements and the protection of legitimate business interests. *See Boston Sci. Corp. v. Duberg*, 754 F. Supp. 2d 1033, 1042 (D. Minn. 2010); *Kallok v. Medtronic, Inc.*, 573 N.W.2d 356, 361–62 (Minn. 1998).    Minnesota courts have found that employers have a legitimate business interest in protecting their

18

confidential and trade secret information through the enforcement of restrictive covenants. *Lapidus v. Lurie LLP*, No. A17-1656, 2018 WL 3014698, at *6 (Minn. Ct. App. June 18, 2018) (enforcing two-year non-service covenant); *see also Twin City Catering, Inc. v. Lafond*, No. C2-01-886, 2001 WL 1335685, at *3 (Minn. Ct. App. Oct. 30, 2001) (enforcing noncompete to protect "customer preferences and confidential pricing information").

While the Minnesota Legislature recently prohibited noncompete agreements as unenforceable under Minnesota law, Minn. Stat. § 181.988 (2023), this law is not retroactive. *See* 2023 Minn. Laws ch. 53, art. 6, § 1 at 49–50) (stating "This section is effective July 1, 2023, and applies to contracts and agreements entered into on or after that date."); *see also* Minn. Stat. § 645.21 ("No law shall be construed to be retroactive unless clearly and manifestly so intended by the legislature."); *Choreo, LLC v. Lors*, __ F. Supp. 3d __, No. 4:25-cv-00077-SMR-SBJ, 2025 WL 973194, at *5 (S.D. Iowa Apr. 1, 2025) (noting Minn. Stat. § 181.988 is not retroactive). Rather, the statute applies only to agreements entered into after the effective date of the statute, 2023 Minn. Laws ch. 53, art. 6, § 1 at 49–50, and also, it does not apply to nondisclosure agreements, or agreements designed to protect trade secrets or confidential information. Minn. Stat. § 181.988, subd. 1(a)(3).

The Agreement here was entered into in 2005 and therefore falls outside the scope of Minn. Stat. § 181.988, which the Agreement predates by many years. Thus, the Agreement's noncompete provision is "subject to Minnesota's common law approach of holding such covenants enforceable when they protect legitimate business interests and do

so with limitations no broader than necessary." *Choreo,* 2025 WL 973194, at *5 (finding one- and two-year restrictive covenants prohibiting employees from soliciting a defined list of clients, and non-disclosure provision, reasonable under Minnesota law).

Starkey has shown that Chromatic could derive substantial benefits from accessing Starkey's trade secrets through former Starkey employees. (Cook Decl. ¶ 14.) Accordingly, the Court finds that under this limited record, the general public interest in enforcing valid agreements that include both confidentiality and noncompete provisions, supports the issuance of a TRO to maintain the status quo.

On balance, the Court finds that consideration of the *Dataphase* factors weighs in Starkey's favor. Therefore, the Court grants a TRO to maintain the status quo.

## III.    CONCLUSION

Based on the submissions and the entire file and proceedings herein, **IT IS HEREBY ORDERED** that

1. Plaintiff's Motion for a Temporary Restraining Order [Doc. No. 5] is **GRANTED**.

2. Defendant shall immediately return any and all copies of Plaintiff's documents, including its confidential and/or trade secret documents, to Plaintiff.

3. For the purposes of this order, the word "communicate" means to disseminate, exchange, provide, share, or transfer any fact or information regardless of the means by which it is accomplished. A communication includes any documents attached to the communication.

4. Defendant shall not communicate Starkey's confidential or trade secret documents or materials to any third party.

5. Defendant shall not use any of Plaintiff's confidential or trade secret documents or materials.

6. Defendant shall not work for any competitor of Starkey, including Chromatic, Inc., for a period of 90 days from his last day of his employment with Starkey.

7. Consistent with Fed. R. Civ. P. 65(c), this Order shall be secured by a bond in the amount of $20,000. Plaintiff Starkey Laboratories, Inc. shall post this bond no later than seven calendar days after the date of this Order.

Dated: July 7, 2025                                    s/Susan Richard Nelson
                                                       SUSAN RICHARD NELSON
                                                       United States District Judge